## Grimes v. Langevin.

Nov. 24, 1939.

As Extended on Denial of Rehearing March 22, 1940.

Porter Sims, Judge.

N. F. Harper for appellant.

W. D. Gilliam for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On March 12, 1936, Grimes sued Langevin seeking to recover $2,000 with interest, on a negotiable note alleged to have been executed and delivered to one F. E. Bradley by Langevin on November 13, 1930, due in twelve months from date, and on June 3, 1931, prior to maturity, assigned to Grimes. Concurrent with the making of the note, defendant delivered to Bradley a mortgage on certain described oil leases located in Allen County, Kentucky. Plaintiff plead failure of payment, and facts which made his petition sufficient in form and substance, and asked judgment for his debt, and the enforcement of his alleged lien.

Answering, Langevin admitted the execution and delivery of the note, but alleged that it was without consideration, and that he received no benefit by reason of its execution. He denies that same was transferred by Bradley to plaintiff for value received. He also denied

the execution or delivery of the mortgage, and that plaintiff at the time of suit was the "absolute" owner of the note or entitled to any enforcement of lien on the alleged mortgaged property.

After proof had been taken by depositions, and before submission of the case, defendant, without objection by plaintiff, was permitted to file an amended answer, which he also made a counterclaim against plaintiff. In this pleading he alleged in substance that at the time of the execution of the note to Bradley it was not intended by either party that the note should constitute or be considered as a legal obligation of the maker to pay the same or any part thereof, but was executed by defendant in the good faith belief, formed on the promises and declarations on the part of Bradley, that the note was to be used only as a basis of credit, and to enable Bradley to raise a sum of money so as he could embark in a new business enterprise, and that defendant would not be expected to pay any part of said note; that the alleged mortgage was merely a memorandum confirming the execution of the note, and was never intended to create a lien on the lease embraced therein.

He also alleges that the purported mortgage was not executed by him; was not read by him at the time he signed it, and he had no actual knowledge of the mortgage placing a lien on his properties, until long after the plaintiff claimed to be the owner of it and the note; that as soon as he received such knowledge he repudiated both the note and mortgage.

Defendant alleged affirmatively that plaintiff is not the owner of the note or mortgage for valuable or any consideration, but that either F. E. Bradley or T. P. Bradley, or both, with the connivance and understanding of plaintiff, transferred the note for the purpose of defrauding and cheating defendant, and to pass the note and alleged mortgage without consideration, and hence plaintiff is not an innocent purchaser in good faith, without notice. On this plea defendant asked for dismissal of plaintiff's petition, and on his counterclaim judgment cancelling the note and mortgage.

There were no demurrers or other dilatory pleas filed, nor did plaintiff make reply to the original or amended answers, but all affirmative matter in "any

pleading not specifically pleaded to is, in all things, controverted of record.'' So, as it appears, the issues were completed and upon submission on pleadings and depositions, the court denied recovery and dismissed the petition.

A determination of the matter before us requires a statement of the proof adduced. Appellant urges that the proof introduced by appellant (his testimony alone) sufficiently shows that there was no consideration for the execution of the $2,000 note; that it was in truth executed as an accommodation to one Frank Bradley, who in a very questionable and collusive manner transferred it to Grimes.

Prior to August 1928 Langevin was approached by Frank Bradley, who represented to him that he owned some oil leases in Allen County and desired to sell out. It appears that Bradley merely had options on two leases, known throughout the record as the Allen and Satterfield leases. Langevin went to Scottsville and made some inquiries and found that in order to obtain the leases desired he would have to deal with C. A. Gilliam, since he was also interested in a Hill lease, and agreed to purchase the first two named, if he could procure the latter, and succeeded, though the Hill lease appears to have been purchased from Frank Tapp. When these leases were transferred to Langevin he paid $9,000 in cash and was to pay the balance in 90 days, all of which he says he paid, save $500.

About the time of the purchase Langevin sold a half-interest in his leases to Frank Bradley for $6,000. By the terms of this lease Langevin was to make a clear title to the interest when the $6,000 note executed to him by Bradley was discharged. It was stipulated in the contract that Bradley was to make monthly payments of $100 upon receipt of checks from the oil purchasing company for his, Bradley's, one-half the oil runs, after deduction of operating expenses.

Several days prior to November 14, 1930, Bradley approached Langevin and wanted to borrow $2,000, saying he was ''going to put oil in bottles, and put them in chain stores where motorists would buy them. He said it was a new scheme, and he wanted me to let him use this $2,000 for a year. I told him I didn't have

this $2,000. The following day I received a letter from Morehead in which he said he had found a man who would let him have the money if I would sign a note for him.'' A letter substantially to that effect was exhibited.

Bradley turned up in Louisville on November 14, 1930, and called Langevin, and the two went to a hotel and there met a man named Noe, a friend of Bradley's, and Mr. Noe said:

"I will let Frank have the money, and then he was gone. Mr. Noe didn't ask for my note. Then Frank took me over to a lawyer's office, * * * the lawyer pulled out these papers that had already been prepared. The note, mortgage and contract. I had nothing to do with the writing of them in any way. I read them naturally before I signed them. I don't know anything about papers of that kind, and the only thing I understand was that I was accommodating Frank Bradley with a loan of $2,000, and that he was to pay back this $2,000 in a year, with interest. I was never in law before in my life."

The note exhibited is endorsed on the back: "F. E. Bradley, and without recourse." The certificate of chattel mortgage is endorsed, "I hereby transfer my interest in the within mortgage to C. M. Grimes without recourse. F. E. Bradley." Langevin says that he at no time acknowledged the mortgage, but that on the next day it was discovered that there had been no acknowledgment, and Langevin went to the Kentucky Hotel where a notary added a jurat.

On the original of this mortgage appears the following endorsement:

"For value received, I hereby assign and transfer the notes mentioned in the foregoing mortgage to C. M. Grimes, of the City of Anderson, County of ———, Indiana, this 3d day of June 1931. F. E. Bradley."

Langevin says that the note and mortgage had been prepared when he went with Bradley to the lawyer's office, but that the stenographer prepared a "little piece of paper," after they got to the office. This document referred to as a "scrap of paper," was an agreement

that if Bradley should repay the $2,000 when due, he was to be released from this and other obligations.

We divert at this point to show how and when this particular $2,000 note fell into the hands of the plaintiff Grimes. Grimes lived in Anderson, Indiana. Frank Bradley is Grimes' nephew. T. P. Bradley, who appears later, is a brother-in-law of Grimes.

The Bradleys lived in Louisville. Grimes was known as a money lender. He did business with no bank. His transactions appear to have been on a cash basis, as he claims, for thirty years. He had had dealings with Frank for several years, principally loaning him money. He says that on the date shown on the transfer of mortgage, Frank transferred the Langevin note to him. Frank at that time owed his uncle $1,500; he took the note and gave Frank $500 in cash. He, Grimes, says positively that he knew nothing of any claimed irregularity in the deal between Langevin and Bradley. He knew they were jointly interested in some oil leases. He says he knew that a contract had been entered into at the time of the execution of the note and mortgage by which "Bradley by paying Langevin $2,000 could redeem his interest in the property." He says that he understood that if Bradley failed to pay, Langevin was to get "all the property. Frank said he could not pay, and wanted to turn it over to me. He didn't think he could redeem it at that time."

It was explained to him that this $2,000 was the purchase price Langevin was paying Frank for his interest, and that "as far as he was concerned the leases were gone." Grimes says he talked to Langevin about the transaction once in Louisville, and tried to collect the note from him. Grimes had turned the note over to T. P. Bradley to "handle." He says that shortly before the taking of depositions he made Langevin a proposition. "He had some oil runs and owned an interest in a refinery, and I wanted him to give me some of the oil runs, and he agreed, but a little later backed out, and this Joe Allen lease, he wanted me to take, but I wouldn't take it." During these times Grimes says that Langevin made no claims of anything wrong with the note or mortgage, except "that I didn't have any business with it; he said he didn't give it to me, and got

sore because I had it. He got sore because Frank sold it to me without notifying him, so I dismissed him and turned the note over to T. P. Bradley to handle for me.'' There was no check, account or any memorandum displayed, relating to the deal between Grimes and Frank Bradley.

Frank Bradley testified at length as to his earlier dealings with Langevin, and as to the note transaction, insists that it was given in payment of a sale of his ''cash equities'' in the original leases with right to redeem, and bears out his uncle fully in respect to the transactions between them.

We have given enough of the oral evidence to show the contentions of the parties, and may say that same, as to the transaction between Bradley and Langevin, is subject to some criticism, and perhaps to an extent as to justify the chancellor's belief, if such he had, that there was lack of valuable consideration.

However, this suit between maker and assignee presents a different situation, since the question we are urged to consider is whether or not the purchase of the note by Grimes before maturity was in due course; without notice of its infirmity, or with the knowledge on his part of the existence of such facts, that in taking the instrument the assignee acted in bad faith. Kentucky Statutes, Section 3720b-56; Harrison v. Ford, 158 Ky. 467, 165 S. W. 663.

It is insisted by appellant that coupled with the facts we have stated, the memorandum attached to the note was couched in such terms as to put Grimes on notice that the transaction was not bona fide. We have carefully examined the criticized document, and are unable to so view it. It emphasizes the fact that Bradley had on that date received of Langevin $2,000. In the memorandum it was agreed that unless the $2,000 was paid in twelve months, Bradley was to relinquish any and all claim to the properties mentioned in the *note* given by Langevin and endorsed by Bradley. This simply ratified the terms of the mortgage, and further had reference to a *previous* contract ''between Langevin and Bradley,'' undoubtedly the mortgage given Langevin by Bradley, when the latter purchased (or was practically given) an interest in the leased property. Grimes

says that he understood that if Bradley failed to pay the note, Bradley would lose what he called his "cash equity," and all other rights under the lease contract between himself and Langevin, as expressed in the memorandum, and he also understood that Bradley could not make payment. The misplacing of names was evidently a misprision, but such did not affect the note itself, nor the mortgage given to secure its payment. It might have been that Langevin was intending by the memorandum to relieve himself of the original "one sided" contract; if so, there was consideration.

We are reminded by appellant of the provisions of Section 3720b-59, Kentucky Statutes, which he argues placed a burden on the holder, under the existing facts and circumstances. This section reads:

"Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course."

In applying this statute it has been held in the case cited by appellant, that the quoted section "prescribes a rule of practice whereby the burden is first upon the maker of the instrument to show the defect therein, and when shown it becomes the duty of the holder to show that he obtained it in due course, which includes his obtention without notice of the defect, and this section has been so applied in every case in this court where the question was presented, as will be seen" by reference to numerous cases cited in Owsley County Deposit Bank v. Burns, 196 Ky. 359, 244 S. W. 755.

That the foregoing is the established rule of procedure, there can be no question, as will be seen from a perusal of the cases cited in Burns' case, supra, though the rule is stated in some of the cases in somewhat different language, for example, Lynchburg Shoe Company v. Hensley, 186 Ky. 769, 218 S. W. 243.

The record shows that plaintiff set out in his petition such facts as manifested him to be a holder in due course. Defendant first merely answered in denial, without affirmative plea; after proof was in he amended, wherein he plead no consideration, with the additional

plea that Bradley and plaintiff had conspired to transfer a note for which there was no consideration, asserting that the mortgage was understood between defendant and Bradley to be merely a memorandum "confirming the execution of the note."

In the case of Worden v. Kennedy, 246 Ky. 716, 720, 56 S. W. (2d) 329, 331, in which both fraud and lack of consideration were plead by the maker of the note, we held that "conceding that Worden executed his note without consideration, and that it was obtained by fraud, the Lincoln Bank & Trust Company, being a holder in due course, within the meaning of this term as it is used in Section 3720b-52, Kentucky Statutes, the petition and amended petition contain no allegation showing or tending to show knowledge thereof on the part of the Lincoln Bank & Trust Company, or its knowledge of such facts that its action in taking the note as collateral amounted to bad faith," citing statutes and cases, among which is Smith v. Greife, 243 Ky. 390, 48 S. W. (2d) 542, 543, which is in point, since here, as there, the record "reveals no testimony tending to show that the plaintiff was not a holder in due course. Being such a holder, the instrument in the hands of the plaintiff was not subject to the defenses interposed." Defense was that "the payee had procured the note by fraud and misrepresentation, and without consideration."

We have examined the amended answer, which was also a counterclaim, and have some difficulty in ascertaining whether or not it sufficiently pleads knowledge on the part of the holder that there was a lack of consideration. The gist of this plea (counterclaim) is that Bradley and Grimes entered into a conspiracy to defraud appellee, by transferring to the latter a note lacking consideration. The relief sought was a cancellation of the note and mortgage. On the charge of conspiracy or fraud, the burden rested on appellee. Stevens v. Bailey, 228 Ky. 436, 15 S. W. (2d) 263, and on this point the proof falls far short of sustaining such a charge; in fact it is only argued that certain suspicious circumstances, which we have detailed supra, tend to sustain this, and the charges of knowledge of infirmity or bad faith. They were insufficient for that purpose. Davis v. McKinley, 212 Ky. 491, 270 S. W. 958, and cases therein cited.

After a careful consideration of the record, we are of the opinion that if the burden was properly placed on appellee by the pleadings and testimony of appellant throughout the case, the evidence shows that Grimes was a holder in due course, and did not act in bad faith in purchasing the note.

Judgment reversed with directions to set same aside, and to enter judgment for appellant.

The whole court sitting.